UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

BERNARD MANALE                                    CIVIL ACTION

versus                                            NO.  05-2546

PAUL REVERE LIFE INSURANCE CO.                    SECTION: E/1

## RULING ON MOTIONS

This matter is before the court on the following cross motions for summary judgment: 1) Plaintiff's ("Manale") motion for summary judgment (r.d. #25); and 2) Defendant's ("Paul Revere") motion for summary judgment to determine the existence of an ERISA policy (r.d. #29), 3) motion for summary judgment on the merits of its claim determination, assuming the policy at issue is **NOT** an ERISA policy (r.d. #31), and 4) motion for summary judgment on the merits of its claim determination, assuming the policy at issue **IS** an ERISA policy (r.d. #36).  The motions were considered on the briefs, without oral argument.  After consideration of the record, the memoranda, and the law, the court is prepared to rule.

## BACKGROUND

The following relevant facts are not in dispute.  Manale is an orthopedic surgeon.  In 1989, when he was a shareholder/employee of New Orleans Orthopedic Clinic, he applied for a long term disability (LTD) insurance policy from Paul Revere.  The policy, Policy #0102426550, was issued effective on February 1, 1990.  At the time Manale purchased the policy, he also purchased a "Lifetime

Total Disability Benefit Rider" for which he paid an additional premium.   In March of 2002, at the age of 64[1], Manale became totally disabled due to a heart condition.   Six months[2] after he became disabled and made a claim on his LTD policy, Paul Revere began paying monthly benefits of $14,800.00[3] under the terms of the policy, effective September 9, 2002.   Paul Revere continued to pay the full monthly benefit amount of $14,800.00 until March 9, 2005, 24 months after Manale's 65th birthday, and 30 months after he began receiving monthly benefit payments.   After that date, Paul Revere continued to pay a monthly disability benefit to Manale, but at the reduced amount of $1,480.00, ten percent of the previously paid full monthly benefit amount.

Disagreeing with this determination, Manale sued for damages and specific performance in state court[4], claiming that under the terms of the policy he is entitled to the full monthly amount of $14,800.00 for the remainder of his lifetime.   He also brought a claim pursuant to La. R.S. 22:657, providing for a penalty of double the amount of the benefits he claims are due to him under

---

[1]Manale's 64th birthday was March 3, 2002.

[2]The policy had a 180 day exclusionary period.

[3]Manale took advantage of Schedule III of the policy, providing for automatic increases in the monthly total disability benefit of $12,300.00 shown on the face of the policy, by increasing the premium he paid annually for five years, thereby increasing his monthly benefit to $14,800.00. Throughout this discussion, anywhere that the copy of the policy at issue shows "$12,300.00" as the maximum monthly benefit amount, that amount is actually $14,800.00.

[4]Generally, "Petition for Damages and Specific Performance", ¶¶ 11-15.

the terms of the policy, together with attorney's fees. Alternatively, Manale alleges misrepresentation, detrimental reliance, and waiver of any policy provisions limiting the monthly benefit to $1,480.00.  Paul Revere removed the action to federal court alleging both federal question jurisdiction pursuant to ERISA and diversity jurisdiction.  Manale disputes that this policy is governed by ERISA, but acknowledges that diversity jurisdiction exists.[5]  For the purposes of these cross motions for summary judgment, the court assumes, as Manale claims, that the policy at issue is not governed by ERISA, and that federal jurisdiction is based on diversity pursuant to 28 U.S.C. §1332.[6]

## ANALYSIS

A motion for summary judgment is properly granted only if there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L. Ed. 3d 265 (1986).  An issue is material if its resolution could affect the outcome of the action.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  In deciding whether a fact issue has been created, we must view the facts and the inferences to be drawn therefrom in the light most

---

[5]See Manale's Memorandum in Support of Motion for Summary Judgment, p. 2, n.4.

[6]For the reasons that will become evident in the discussion that follows, the question of whether the policy is governed by ERISA is immaterial.

favorable to the nonmoving party.  See Olabisiomotosho v. City of Houston, 185 F.3d 521, 525 (5th Cir. 1999).  However, once a moving party properly supports a motion for summary judgment, the nonmoving party "must go beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  Lawrence v. Univ. of Tex. Med. Branch at Galveston, 163 F.3d 309, 311-12 (5th Cir. 1999), quoting Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047-48 (5th Cir. 1996).  The nonmoving party cannot satisfy its burden with "unsubstantiated assertions" or "conclusory allegations."  Id.  If the opposing party bears the burden of proof at trial, the moving party need not submit evidentiary documents to properly support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case.  Saunders v. Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1999).

In a diversity case, a federal district court is bound by the forum state's substantive law.  American Gen. Ins. Co. v. Ryan, 274 F.3d 319, 328 (5th Cir. 2001).  The substantive law of Louisiana provides that a contract has the effect of law for the parties to the contract.  La. C.C. art. 1983.  "Interpretation of a contract is the determination of the common intent of the parties."  La. C.C. art. 2045.  "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."  La.

-4-

C.C. art. 2046.   Words in a contract are to be given their
generally prevailing and ordinary meaning, unless they have
acquired a technical meaning.   La. C.C. art 2047; <u>Schroeder v.
Board of Supervisors of La. State Univ.</u>, 591 So.2d 3432, 345 (La.
1991).

In 1994, in <u>Louisiana Insurance Guaranty Ass/n v. Interstate
Fire and Cas. Co.</u>, 630 So.2d 759, 763-764 (La. 1994)(hereinafter
<u>LIGA</u>), the Louisiana Supreme Court stated the principles regarding
construction of insurance policies as follows:

> An insurance policy is a contract between the
> parties and should be construed by using the
> general rules of interpretation of contracts
> set forth in the Civil Code.   The judicial
> responsibility in interpreting insurance
> contracts is to determine the parties' common
> intent.
>
> The parties' intent as reflected by the words
> in the policy determine the extent of
> coverage.   Such intent is to be determined in
> accordance with the general, ordinary, plain
> and popular meaning of the words used in the
> policy unless the words have acquired a
> technical meaning.
>
> An insurance policy should not be interpreted
> in an unreasonable or a strained manner so as
> to enlarge or restrict its provisions beyond
> what is reasonably contemplated by its terms
> or so as to achieve an absurd conclusion.
> Absent a conflict with statutory provisions or
> public policy, insurers, like other
> individuals, are entitled to limit their
> liability and to impose and to enforce
> reasonable conditions upon the policy
> obligations they contractually assume.
>
> Ambiguity in an insurance policy must be
> resolved by construing the policy as a whole;

one policy provision is not to be construed separately at the expense of disregarding other policy provisions.

If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured. This rule of strict construction requires that ambiguous policy provisions be construed against the insurer who issued the policy and in favor of coverage to the insured. ....

"Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." Breland v. Schilling, 550 So.2d 609, 610-11 (La. 1989). The court should construe the policy "to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry." Trinity Industries, 916 F.2d at 269 (5th Cir. 1990). In insurance parlance, this is labeled as the reasonable expectations doctrine.

Yet, if the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written. When the language of an insurance policy is clear, courts lack the authority to change or alter its terms under the guise of interpretation. The determination of whether a contract is clear or ambiguous is a question of law.

Id., (footnotes and other citations omitted).

In the LIGA case, decided on cross motions for summary judgment pursuant to a declaratory judgment action, the precise issue presented to the Court was "whether the excess insurer ... was liable only for the amount of the insured's loss above the

specified underlying primary limits, or whether it is liable to provide drop down coverage and essentially step into the shoes of the insolvent underlying insurer ..." Id., at 762. The district court granted the LIGA's motion and held that Interstate's excess policies provided drop down coverage and must pay claims by or against the primary insurer, which was insolvent, before LIGA had any obligation to pay. Id., at 761. The appellate court affirmed with the qualification that Interstate's drop down obligation was not unconditional. Id. Both courts' decisions were based on the construction of the loss payable clause contained in the limits of liability provision of the excess insurance policy. Id., at 765.

The Supreme Court granted Interstate's writ application. In its analysis, the Supreme Court observed that the sole source of the  alleged ambiguity in the excess insurance policy was contained in one sentence. Id., at 765-66. "Resolution of this case turns on whether the fourth sentence of Interstate's limits of liability provision requires Interstate to drop down and assume the insolvent primary insurer's ... obligations." Id. The Court observed:

> At the outset, we note that though we agree with the appellate court's conclusion that the Interstate policy could have more clearly delineated its payment obligation, "that fact does not mandate the conclusion that the policy was legally ambiguous." Garmany v. Mission Ins. Co., 785 F.2d 941, 945-46 (11th Cir. 1986). Stated differently, merely because an insurance policy is a complex instrument requiring analysis to understand it does not render it ambiguous.

Id. After construing Interstate's policy as a whole, the Supreme Court reversed, finding no indication from the single "ambiguous" sentence that the parties intended Interstate's coverage "drop down" in the event of the primary insurer's insolvency. Id.

The lawsuit at bar also boils down to a single disputed issue of policy interpretation: what is the correct amount of the monthly benefits paid to Manale under the terms and conditions of his policy? Manale argues that the clear wording of the policy provides him with lifetime monthly disability benefits in the amount of $14,800.00.

Like the plaintiff in the LIGA case, Manale bases his interpretation of his LTD insurance contract on the wording of a single item in the policy, SCHEDULE II of the policy which includes the following provision:

MAXIMUM BENEFIT PERIODS

FOR INJURY AND SICKNESS:

TOTAL DISABILITY STARTING       BEFORE AGE 65              LIFETIME

As further support for his position, Manale points to the TABLE OF ADDITIONAL BENEFITS which states as follows:

| ADDITIONAL BENEFITS ATTACHED | AMOUNT OF BENEFITS | MAXIMUM BENEFIT PERIOD | ANNUAL PREMIUM PRIOR TO AGE 65 |
|---|---|---|---|
| LIFETIME TOTAL DISABILITY | $12,300.00 PER MONTH | LIFETIME | $1,809.33 |
| TOTAL DISABILITY IN YOUR OCCUPATION | | | $698.64 |

However, both SCHEDULE II and the TABLE OF ADDITIONAL BENEFITS appear in the section entitled POLICY SCHEDULE. When read in its

entirety, the **POLICY SCHEDULE** includes (1) a **PREMIUM SUMMARY** which specifies the annual premium for total disability benefits *and* the annual premium for *additional benefits*, (2) the **TABLE OF TOTAL DISABILITY BENEFITS** which states that the maximum benefit period for total disability benefits for sickness *terminates at age 65*, with a qualification that references **SCHEDULE II**, (3) the **TABLE OF ADDITIONAL BENEFITS**, and (4) on the second page, **POLICY SCHEDULE II**, which describes the **MAXIMUM BENEFIT PERIOD** as lifetime, but does not reference the amount of the monthly lifetime benefit[7]. The term **MAXIMUM BENEFIT PERIOD** is further defined in the policy as "the longest period of time We will pay benefits during any Disability.  For Total Disability this period is listed on the Policy Schedule."[8]

Manale must have initially understood that the disability benefits under the LTD policy he purchased terminated at age 65. Otherwise, there would have been no reason for him to also purchase *additional* benefits, the Lifetime Total Disability Rider, the purpose of which was to ensure that he would receive disability benefits, assuming that he became disabled from working as an orthopedic surgeon under the terms of the LTD policy prior to age 65, for the remainder of his life.  The rider is attached to the LTD policy, and is a part of the entire insurance contract.

---

[7]See Exhibit A attached hereto.  On page 3 is **SCHEDULE III**, which is not at issue here.

[8]See Exhibit B attached hereto.

This Lifetime Total Disability Rider (shown on next page), not the original LTD policy, governs the lifetime total disability benefit that Manale purchased. It describes the terms, conditions and amount of the monthly lifetime benefits that are payable to Manale after the termination of payments under the original LTD policy. According to the terms of the rider, under the caption **LIFETIME BENEFIT AFTER AGE 65**, Manale would be entitled to a "lifetime benefit after age 65" if: 1) he became totally disabled before age 65; and 2) his total disability continues until age 65; and 3) the benefits under the LTD policy to which the rider is added have been paid during his total disability. Manale meets all three qualifying prerequisites. The rider further provides that the lifetime benefit "will start to pay on the later of: (a) your 65th birthday; or (b) the date the Total Disability benefit payable under Your Policy ends." Manale's lifetime benefit payments began when the Total Disability benefit payable under his policy ended. The rider goes on to explain that the amount of the monthly lifetime benefit is *based on the amount shown on the policy schedule*. A table of factors is included, which provides a "factor" which will be multiplied by the amount shown on the policy schedule to determine the amount of the monthly lifetime benefit. Had Manale become totally disabled at age 55, he would have been entitled to the full monthly amount of $14,800.00 for life. Had he become totally disabled at age 65, he would have been entitled to

-10-

### LIFETIME TOTAL DISABILITY BENEFIT RIDER

This rider provides a Lifetime Total Disability benefit.

**LIFETIME BENEFIT AFTER AGE 65**

We will pay this benefit during Your continuous Total Disability if:

1. The Total Disability begins before age 65; and
2. The Total Disability continues until age 65; and
3. The benefits under the Policy to which this rider is added have been paid during Your Total Disability.

This benefit will start to pay on the later of: (a) Your 65th birthday; or (b) the date the Total Disability benefit payable under Your Policy ends. We will pay it while You remain Totally Disabled for as long as You live.

**FOR INJURY**

For Total Disability due to Injury, the monthly amount We will pay will be based on the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount.

**FOR SICKNESS**

For Total Disability due to Sickness, the monthly amount We will pay will be based on the amount shown on the Policy Schedule. Any Cost of Living benefit rider added to Your Policy shall apply to this amount. The amount shown on the Policy Schedule plus any Cost of Living increase that applies to this rider shall be multiplied by a factor. The factor to be used will be based on Your age at the start of Total Disability which continues until age 65.

**Factors by age for Total Disability due to Sickness**

1.0 for 55 or less
.9 for 56          .4 for 61
.8 for 57          .3 for 62
.7 for 58          .2 for 63
.6 for 59          .1 for 64

If a larger amount is payable under this Policy for the same period, the larger benefit will be payable in lieu of this benefit.

**GENERAL**

This rider will end:

1. At the same time the Policy ends; or
2. On Your 65th birthday,

whichever happens first.

All definitions in Your Policy apply to this rider. All provisions of Your Policy stay the same except where We change them by this rider.

The annual premium for this rider is shown on the Policy Schedule.

The Date of Issue of this rider is the same as that of Your Policy. If We issued this rider after Your Policy, the Date of Issue is shown below.

Signed for Us at Worcester, Massachusetts.

THE PAUL REVERE LIFE INSURANCE COMPANY

Secretary                    President and CEO

no lifetime monthly benefits.  Because he became totally disabled
at age 64, he is entitled to 10% of the monthly benefit amount paid
under his LTD policy, or $1,480.00 per month for life.

Taken out of context, as Manale does, the limited language in **SCHEDULE II** and the **TABLE OF ADDITIONAL BENEFITS** may appear to be ambiguous regarding the amount of the monthly lifetime benefit. However, the suggested ambiguity is resolved when the policy as a whole, including the Lifetime Total Disability Rider, is read together.[9] To find otherwise would unreasonably enlarge the LTD policy's provisions beyond what was reasonably contemplated by its terms, and would provide Manale with a windfall that was not intended or contemplated under the terms of the whole contract.

Although his Petition alternatively alleges misrepresentation, detrimental reliance, and waiver of any policy provisions limiting the monthly benefit to $1,480.00, Manale does not address these allegations in his motion for summary judgment. The court will address his argument, instead, that he is entitled to penalties and attorney's fees pursuant to La. R.S. 22:657.[10] He asserts that, even assuming the rider governs the *monthly amount of the lifetime* benefit, he had a "reasonable expectation" that he is still entitled to the full monthly benefit of $14,800.00. He cites the

---

[9]As the Louisiana Supreme Court observed regarding the Interstate's excess policy in LIGA, 630 So.2d at 766, Paul Revere's LTD policy could have been more clearly worded. Any confusion could have been avoided by a brief qualification to the TABLE OF ADDITIONAL BENEFITS noting that the monthly *benefit amount is based* on the amount shown, pursuant to the factors listed in Lifetime Total Disability Rider.

[10]Since this court has already determined that Manale is not entitled to the benefits he is claiming under his LTD insurance policy, he is not entitled to penalties and attorney fees under La. R.S. 22:657. However, the court will construe his arguments on that claim as relevant to his alternative allegations against Paul Revere regarding misrepresentation, detrimental reliance, and waiver.

-12-

following language that is included in the **LIFETIME TOTAL DISABILITY BENEFIT RIDER**:  "If a larger amount is payable under this Policy for the same period, the larger benefit will be payable in lieu of this benefit." He argues that because **SCHEDULE II** of the LTD provides for the full amount of the monthly benefit for his lifetime, that is a larger amount that is payable to him in lieu of the reduced lifetime monthly amount. Manale also points out that Paul Revere actually did pay him the full $14,800.00 monthly for two years beyond his 65th birthday, although it now argues that the LTD policy benefits terminated at age 65, therefore his expectation that he is entitled to the full amount of the monthly benefit for his lifetime is reasonable.

Paul Revere explains its continued payment of the full monthly benefits beyond Manale's 65th birthday in its memorandum in opposition to Manale's motion for summary judgment, at p. 12 n.3. Manale's LTD policy became effective on February 1, 1990. In 1990, Congress adopted an amendment to the Age Discrimination in Employment Act (ADEA) know as the "Old Workers Benefit Protection Act."[11] The amendment extended coverage for "total disability benefits" for beneficiaries of a policy issued with a "to age 65" limit on disability payments. For example, for total disability starting at age 64 but before age 65, the amendment extended disability benefits for a total of 30 months. Although the amended

---

[11]See Administrative Record, Paul Revere Ex. A-2, PRLCL00371-372.

law was not retroactively applicable to Manale's LTD policy, which became effective before the amendment became applicable, Paul Revere nevertheless applied the amended schedule to his benefits. Manale received his first benefit check dated September 9, 2002, when he was 64 years and 6 months old.  As of his 65th birthday, he had received 6 monthly checks for the full benefit amount under the terms of his LTD policy, because Manale's total disability benefit payments ended when he reach age 65.   Paul Revere voluntarily extended payment of the full monthly benefit amount to Manale for an additional 24 months beyond his 65th birthday, for a total of 30 months in compliance with the Congressional Mandate.  Thus, Paul Revere *did* pay Manale the a larger amount payable under the LTD policy for 24 months after age 65 in lieu of the reduced monthly benefit provided by the Lifetime Total Disability Rider.

Finally, Manale argues that two letters sent to him by Paul Revere, one on July 5, 2000, and the second, on February 3, 2002, support his reasonable expectation that he is entitled to full monthly benefits for his lifetime.[12]  The identical unsigned form letters appear to have been sent in response to a request for information from Manale.  Manale relies on the "brief description of your policy" included in the letters as follows:

o     $14,800.00 monthly while totally disabled due to accidents or sicknesses

--------

[12] See Manale's memorandum in support of motion for summary judgment, Exhibits 1-B and 1-C.

> 180 day waiting period for accidents or sicknesses
> Lifetime benefit period for accidents or sicknesses

o   Total disability in Your Occupation Benefit

Manale's reliance on this limited language in the letters to support his position is not reasonable.  The letters also include the following sentence: "The foregoing benefits are subject to the terms and conditions of the policy and the attached benefits."  At Part 1.1, the LTD policy itself defines the term "policy" as

> the legal contract between You and Us.  The policy, the application, the Policy Schedule, and any attached papers that We call riders, amendments, or endorsements make up the entire contract between You and Us.

Further, at Part 10.1, the policy describes "Entire Contract; Changes" as follows:

> This Policy (with the application and attached papers) is the entire contract between You and Us.  No change in this Policy will be effective until approved by a Company officer. This approval must be noted on or attached to this Policy.  No agent may change this Policy or waive any of its provisions.

The letters Manale relies on are not attached to, and are not a part of the policy, and cannot enlarge or alter the policy coverage, terms and conditions.  Manale cannot show misrepresentation, detrimental reliance, or waiver.

Resolving all disputed facts in favor of Manale, including his assertion that the LTD policy at issue is not governed by ERISA, and considering the law and the evidence, the court concludes that Manale is not entitled to summary judgment in his favor, and Paul

-15-

Revere is entitled to summary judgment in its favor as a matter of law.

Accordingly;

**IT IS ORDERED** that plaintiff Bernard Manale's motion for summary judgment (r.d. # 25) is **DENIED**; and,

**IT IS FURTHER ORDERED** that defendant Paul Revere's motion to for summary judgment on the merits of its claim determination assuming the policy at issue is *NOT* governed by ERISA (r.d. # 31) is **GRANTED**; and,

**IT IS FURTHER ORDERED** that defendant Paul Revere's motion to for summary judgment to determine the existence of an ERISA plan (r.d. # 29) and motion for summary judgment on the merits of its claim determination assuming the policy at issue *IS* governed by ERISA (r.d. # 36) are **DISMISSED AS MOOT**; and,

**IT IS FURTHER ORDERED** that JUDGMENT be entered in favor of defendant Paul Revere and against plaintiff Bernard Manale.

New Orleans, Louisiana, this 24th day of May, 2007.

_Marcel Livaudais_.

**MARCEL LIVAUDAIS, JR.**
**Senior United States District Judge**

-16-